WILSON *v.* DOEHLER-JARVIS DIVISION OF NATIONAL LEAD COMPANY.

1. WORKMEN'S COMPENSATION—FINDINGS OF FACT—SUPREME COURT —EVIDENCE.

Findings of fact by the workmen's compensation appeal board are binding upon the Supreme Court, if the record contains evidence to support them (CL 1948, § 413.12).

2. SAME—FINDINGS OF FACT—PROXIMATE CAUSE—CANCER—DEATH— EVIDENCE.

The workmen's compensation appeal board's findings that plaintiff's decedent, defendant's employee, had suffered a blow to his lower lip, during employment, which resulted in cancer that spread elsewhere and eventually death resulted from a metastisized cancer, *held*, supported by competent evidence, including testimony that decedent had bumped his lip at work and reinjured it repeatedly during the course of his work, and the testimony of doctor who had treated decedent and the testimony of other experts (CL 1948, § 413.12).

REFERENCES FOR POINTS IN HEADNOTES

[1]  58 Am Jur, Workmen's Compensation § 530.
[3]  58 Am Jur, Workmen's Compensation §§ 326, 414.
[5]  16 Am Jur, Depositions § 16 *et seq.*

3. SAME—CLAIM FOR COMPENSATION—REPORT OF INJURY.

Failure of claimant for workmen's compensation to file claim within period prescribed by statute would not bar recovery of compensation, where, notwithstanding knowledge of injury and condition of employee on part of employer, no report of the accident had been filed, and circumstances were such that not even the injured employee knew for an extended period of time that the cancerous condition which had resulted was due to the injury received, the employer's failure to file report operating as a bar to recourse to the limitation provisions of the statute .(CL 1948, § 412.15).

4. SAME—CROSS-EXAMINATION OF INJURED EMPLOYEE.

Termination by hearing referee of cross-examination of injured employee who finally died of cancer from injury received during course of employment and arising out of it and whose dependents seek workmen's compensation *held*, not to have prejudiced defendant employer's rights, in view of the extended cross-examination which had been had.

5. DEPOSITIONS—RESIDENCE OF WITNESS OVER 50 MILES FROM PLACE OF TRIAL.

The taking of a physician's deposition in a proceeding to recover workmen's compensation *held*, proper, where the witness resided over 50 miles from the place of trial (CL 1948, § 617.6).

Appeal from Workmen's Compensation Appeal Board. Submitted January 8, 1958. (Docket No. 15, Calendar No. 47,232.) Decided July 15, 1958.

Edna Wilson, guardian of Sharon Louise Bentley and Ronald Bentley, minor children of James A. Bentley, deceased, presented claim against Doehler-Jarvis Division of National Lead Company for compensation because of their father's death from cancer following a cut lip suffered in an industrial accident. Award to plaintiff. Defendant appeals. Affirmed.

*Marcus, Kelman, Loria, McCroskey & Finucan* (*Benjamin Marcus* and *Robert Libner,* of counsel), for plaintiff.

*Warner, Norcross & Judd* (*C. A. Bradshaw,* of counsel), for defendant.

EDWARDS, J.   James A. Bentley died as a result of metastasized cancer at 59 years of age.   He left behind a divorced wife who is the plaintiff here as guardian of deceased's 2 minor children.

Prior to his lengthy last illness, Bentley had worked for 10 years for Doehler-Jarvis Corporation in the traffic department, bringing materials from the storeroom to the plant.

It is undisputed on this record that Wilson's death was caused by squamous-cell cancer which infiltrated and developed a large tumor in the area of the submaxillary gland below his left jaw.   It appears apparent that it was this tumor which caused Bentley's disability from work in August of 1952 and, after failure of radiological and operative treatment, led to his death on February 18, 1955.

The medical reports agree, however, that the site of this "explosion" of the cancer was not the primary site of cancer in Wilson's body.   Plaintiff's claim is based on the identification of a small hard area located just below Bentley's lower lip which was biopsied in the search for a primary site for cancer.

Bentley's testimony at trial identified the spot of this small hard area as the site at which he had suffered a blow to the lower lip in January, 1951, 1–1/2 years before his disability.   The company first-aid records were brought in to prove that such a blow indeed did take place.   But the record submitted indicated merely that the injury was to Bentley's "face below the nose," and was dated August 18, 1950.

These 4 disputed issues of fact are argued to us with plaintiff claiming, and defendant denying, the truth of each assertion below:

1. That the small inactive hard place--described on Bentley's lower lip was squamous-cell cancer;

2. That the squamous-cell cancer in the area of 'the submaxillary gland which caused Bentley's death was occasioned by metastasis from the primary site described above;

3. That Bentley suffered an injury to his lower lip during January, 1951; ·

4. That the blow to Bentley's lip in January, 1951, plus subsequent reinjury thereto, either caused or precipitated the squamous-cell cancer which eventually led to his death.

As to all of these factual issues, the workmen's compensation appeal board found for the plaintiff:

"From the record before us we find as follows: deceased was a 58-year-old divorced man, paying more than 50% of the support of 2 of his children (Ronald and Sharon), in January, 1951. He was first employed on March 17, 1943, and last worked on June 2, 1953. On or about January, 1951, deceased worked in the traffic department. His job required him to fill orders for supplies for the shop. As he was tipping off a bundle of cardboard cartons from the top of a pile, 1 of the cartons fell and struck him against the left side of his lower lip cutting the lip and causing it to bleed. He then notified his foreman, Joe Pieckiel, of his injury. Subsequently he bumped the lip on other occasions sufficient to open the bump of the unhealed wound but in a manner and extent that could have been unnoticed had the lip been fully healed. The cut failed to heal for about 6 months and then after healing a white spot appeared and was noticeable for about 3 months. Thereafter a numbness was noted in the area. A bump developed which deceased thought was a boil or carbuncle and he sought medical attention. A biopsy of tissue taken from the injured lip was made. The tissue showed leukoplakia with apparent regeneration of the squamous epithelium, with marked

chronic inflammation and definite islands of neoplastic tissue showing evidence of squamous cell carcinoma. A biopsy of tissue of the submaxillary area shows squamous cell carcinoma. Deceased was unable to work from July, 1952, to November, 1952. After returning to work in November, 1952, his condition grew worse and he had to cease work on June 2, 1953. He subsequently died on February 18, 1955, from an metastasized squamous cell carcinoma. The primary source of the squamous cell cancer was the lip lesion with metastasis downward and deeper. *The medical testimony establishes a causal relation between the trauma received in January, 1951, during the course of decedent's employment with defendant company and the resulting metastasized cancer which ultimately caused death. .The evidence establishes a cause and effect relationship between the injury received and the death on February 18, 1955."* (Emphasis supplied.)

Our review of disputes of fact in workmen's compensation proceedings is, as we have repeatedly noted, distinctly limited; and these findings are, of course, binding upon the court if the record contains evidence to support them. CL 1948, § 413.12 (Stat Ann 1950 Rev § 17.186); *Hood* v. *Wyandotte Oil & Fat Co.,* 272 Mich 190; *Thornton* v. *Luria-Dumes Co-Venture,* 347 Mich 160; *White* v. *Michigan Consolidated Gas Co.,* 352 Mich 201.

The crucial finding of fact of the appeal board accepted plaintiff's testimony that he had suffered a blow in January, 1951, and that it had been to his lower lip. The appeal board likewise accepted plaintiff's medical testimony to the general effect that the hard place on plaintiff's lower lip was cancerous and was the primary site from which the fatal spread of the cancer occurred.

All of these findings are in conflict with substantial testimony presented by the defendant; but our review of this record indicates that there was like-

wise competent evidence from which these findings of fact could have been made.

The crucial finding of the appeal board, however, is contained in these 2 sentences:

"The medical testimony establishes a causal relation between the trauma received in January, 1951, during the course of decedent's employment with defendant company and the resulting metastasized cancer which ultimately caused death. The evidence establishes a cause and effect relationship between the injury received and the death on February 18, 1955."

The record contains the testimony of plaintiff's expert witness, Dr. Gabriel Steiner, who is identified as a specialist in neuropathology and pathology.

Dr. Steiner was asked to answer a hypothetical question containing these facts, which we have reviewed against this record and found supported there:

"Mr. James Bentley, born in approximately January of 1896, was an employee of the Doehler-Jarvis Corporation. While so employed, in approximately January of 1951 while working in a narrow area, he cut his lip.

"During his lifetime he testified for us and stated that the lip did not completely heal for 5 or 6 months, and that during that time and because of the tightness of the place in which he had to work, between 2 narrow vertical walls in which material was stored, he had bumped his lip many times. He stated that he didn't lose any time because of it and when it finally healed, which was 5 or 6 months later—

"*A.* You said 5 to 6 months later?

"*Q.* Five to 6 months later, the white spot over the site of the trauma was still there. That went away, but a numb spot remained there, and, as he said, never went away.

"In May of 1952 he noticed a lump in the submaxillary area and during a vacation period he consulted a Dr. Bruggema. It was in August of 1952 that we have the first biopsy of the submaxillary area, which has been referred to by yourself and read, being exhibit H.

"He was then referred to Dr. Fellows, a radiologist at Grand Rapids, as of August of 1952 for further care. He instituted a further search, and in September of 1952 a biopsy of the lip was had which has been identified as exhibit K."

After some discussion of the difficulty of the problem, Dr. Steiner's answer was:

*"It is my firm belief that in the case of this man, the repeated injuries produced or were an essential factor in the production of his squamous cell carcinoma of the lip."* (Emphasis supplied.)

"Q. Then you previously stated that your opinion was that the area in the submaxillary region was secondary to the lip, and that death resulted from the entire—

"A. Spread of the cancer.

"Q. Would it then follow that this man's disability and death from the cancer was related in your opinion or could reasonably be related to these injuries as described?

"A. Yes.

"Q. Doctor, what medical significance is there to the testimony that the lip never healed for approximately 5 or 6 months? What does that indicate to you?

"A. That could indicate already the cancerous character of this lesion. I think it is probable, but I have no definite proof for that."

Dr. Steiner had previously testified that the slide taken on biopsy of the lip lesion showed squamous-cell carcinoma, and that, on the medical history given, the lip lesion was the probable primary site of the cancer which resulted in Bentley's death.

There is direct disagreement with Dr. Steiner's testimony in this record, particularly that contained in the testimony of defendant's expert witness, Dr. A. James French, pathologist of the University of Michigan hospital. Dr. French stated that he could not make a diagnosis of carcinoma on the material contained in the slide taken from the first biopsy of the lip lesion suffered by Bentley. Dr. French also expressed skepticism about trauma having a relationship to lip cancer. But having identified the condition he saw in the slide of the lip lesion as possibly pre-cancerous, he concluded in answer to plaintiff's hypothetical question:

"I think that there is no reason to state that there isn't a relationship between possible repeated trauma and the changes I found in the lip."

Neither of these expert witnesses, however, had ever seen Bentley or had any part in his treatment while alive. One of the doctors, the radiologist, who did have responsibility for the treatment of Bentley, apparently was the first to formulate the theory upon which this claim is based. His testimony makes evident that he believed it sufficiently to base his treatment thereon.

Dr. Kenneth E. Fellows, who took his training, both as to general medicine and his specialty, radiology, at the University of Michigan, first saw Bentley August 11, 1952, and took a history for the purpose of aiding diagnosis:

"The patient gives a history of having bumped his lip to the left of the midline. That is the lower lip, to the left of the midline approximately 1 year ago, which was followed by a small area that healed but persisted in being numb. He has bumped it from time to time since.

"In May of this year, that is 1952, he developed a small nodule beneath the mandible in the region of

the submaxillary gland, slightly anterior to same, which has progressively increased in size so that the mass now reaches approximately to 9 centimeters in diameter."

Dr. Fellows detailed his examination of the major tumor in the submaxillary area and gave his opinion that this tumor was metastatic. His testimony continues:

"Well, after searching his mouth and pharynx as I stated in the history, we found nothing except this little area in the buccal mucosa opposite this tartar deposit, just very innocuous, but aside from that, we found this thing in the lip and this was the only thing that we could really attach any significance to. In fact, we were a little bit suspicious that that wasn't anything, but I went on and advised a biopsy."

After receiving the first and negative report on the biopsy of the lip lesion, Dr. Fellows asked for a second study and report which was returned with a finding of "leukoplakia possibly malignant." After detailing his examination of Bentley to seek other possible primary sites, Dr. Fellows was asked his opinion about the lip lesion:

"Well, obviously, because we went under the assumption all the time that this was the most suspicious area and this would be the most common drainage site, and there would be an obvious drainage there. That happens every once in a while, you find a low-grade skin cancer, an epithelioma, and that also is more common around the lip, particular in the vermilion border, to undergo auto-sterilization, I guess is the best way to put it. In other words, for some unknown reason, it slows down and the cells don't grow, and become benign, healing over the crater so that it looks innocuous, but actually it is still there."

On the basis of this diagnosis, Dr. Fellows testified he treated the site of the lip lesion with over 5,000

roentgens to seek to sterilize it. On vigorous cross-examination pertaining to whether or not the lip lesion was the primary site, Dr. Fellows said "we were pretty certain," and "it is the only source we could find."

Dr. Fellows, in answer to plaintiff's attorney's hypothetical question as to trauma causing the lip lesion, carefully qualified his answer:

"That it is possible that the trauma might play a part or be a factor. I am not saying it produced it. I am saying that it may be a factor in the production of this lesion."

This record is replete with medical assertions of lack of positive knowledge about the cause of cancer.[*] And yet, with all this uncertainty, the patient was diagnosed and was treated. The appeal board had the task assigned by statute to make findings of fact, if the proofs warranted, as to what caused Bentley's death. We cannot say that its decision is unsupported by competent evidence, particularly when it accords with the testimony of the doctor who had the patient's life in his hands.

As to the procedural errors claimed by defendant, we find much less reason for extensive discussion in this opinion.

Obviously, from what has been recited, defendant knew of the original injury, and of the cancer which Bentley subsequently developed. Defendant complains with vehemence that it was deprived of notice and claim of industrial causation of the cancer condition. The answer, of course, is that Bentley was, too.

The record makes clear that Bentley's first knowledge of possible relationship between the lip blow and lesion of 1951 and the submaxillary tumor of 1952 came from Dr. Fellows in August of 1952 and

---

[*] See Flaxman, Trauma and Cancer, Medical Trial Technique Quarterly, Vol 4, No 4, June, 1958, p 23.

the biopsy of the lip done by a Dr. Wurz in that month. Bentley testified that he discussed the relationship of the blow and the subsequent lip lesion to the tumor with defendant's insurance man within that same month. No report either of the original injury or this subsequent notice as to compensable causation was ever filed by defendant company. Bentley returned to work in November of 1952 and worked until June of 1953. Formal claim was filed first May 13, 1954. The guardian's claim was filed March 28, 1955.

We have previously dealt with the question of whether or not in such a set of circumstances the notice and claim provisions of the statute (CL 1948, § 412.15 [Stat Ann 1950 Rev § 17.165]) bar compensation.

In *Hayes* v. *Detroit Steel Casting Co.,* 328 Mich 609, 614, 615, this Court said:

"It is, we think, reasonably apparent that plaintiff was not aware that he was suffering from psychoneurosis. It cannot be said that such condition was manifest immediately following the injury. It does not appear that a medical diagnosis of the condition was made until after plaintiff's disability had continued for an extended period of time.

"The practical situation is that the injury to the plaintiff resulted in (1) the loss of an eye, and (2) a disabling psychoneurosis, the existence of which was not immediately determined. Under the circumstances we cannot agree with defendants' contention that the failure on plaintiff's part to give notice, and file claim for compensation, within the periods therefor prescribed by the statute, above quoted, bars the recovery of compensation. The facts here are somewhat analogous to those in *Palchak* v. *Murray Corporation of America,* 318 Mich 482, in which an award of compensation was affirmed as against the objection that the claim had not been seasonably filed. See, also, *Jelusich* v. *Wisconsin Land & Lum-*

*ber Co.,* 267 Mich 313; *Rowe* v. *Consumers Power Co.,* 268 Mich 162; *Wilson* v. *Tittle Brothers Packing Co.,* 269 Mich 501."

Further, defendant's failure to file a compensable accident report after deceased's notice of August, 1952, barred its recourse to the limitation provisions of the statute. *Shaw* v. *General Motors Corporation,* 320 Mich 338.

As to appellant's objection to the referee's admission of Bentley's testimony and his failure to strike same after Bentley's death prevented completion of cross-examination, we adopt the reasoning of the appeal board:

"We find the hearing referee's denial of defendant's motion proper and hold defendants were given ample opportunity to cross-examine deceased, and did in fact, exhaustively cross-examine at length. The major portion of the testimony of deceased being elicited under cross-examination. Defendant's rights have not been shown to be prejudiced by termination of deceased's testimony."

A review of the cross-examination conducted leaves us puzzled as to what purpose additional cross-examination would have served. We do not believe defendant's rights to adequate cross-examination were prejudiced, or that the referee abused his discretion. 5 Callaghan's Michigan Pleading & Practice, § 37.169.

Nor do we find error in the admission, over objecttion, of Dr. Steiner's deposition. The appeal board noted:

"The deposition of Dr. Steiner was taken for the reason that he resided more than 50 miles from the place of trial."

We believe this reasoning is consistent with the purposes of the statute. CL 1948, § 617.6 (Stat Ann § 27.854).

Finally, we have reviewed the numerous questions appellant has advanced relative to the exclusion of evidence or appeal board findings claimed not supported by same. Taken as a whole with the argument developed therefrom in appellant's brief, we believe these questions really sought to place the essential and disputed findings of fact of the appeal board before this Court. As a consequence, we began this opinion with a review of the evidence which we feel sustains those findings.

We should, however, comment that each such question has been reviewed separately also and that we have been unable to find any prejudicial error contained therein. Indeed, to our surprise, several of the claimed material facts which appellant asserts were improperly excluded by the referee we have found present in the record.

Affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, VOELKER, and KAVANAGH, JJ., concurred.